# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 26 2018, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT R.B.

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent–Child Relationships of: H.B., T.B., W.B., and D.B. (Minor Children)

and

R.B. (Mother) and D.B. (Father)[1],

*Appellants-Respondents,*

*v.*

The Indiana Department of Child Services,

December 26, 2018

Court of Appeals Case No. 18A-JT-1789

Appeal from the Decatur Circuit Court

The Hon. Timothy Day, Judge

Trial Court Cause Nos.
16C01-1711-JT-443
16C01-1711-JT-444
16C01-1711-JT-445
16C01-1711-JT-446

---

[1] Although Father is a "party on appeal" pursuant to Indiana Rule of Appellate Procedure 17(A), he does not participate in this appeal.

*Appellee-Petitioner.*

**Bradford, Judge.**

# Case Summary

R.B. ("Mother") and D.B. ("Father") are the biological parents of H.B., T.B., W.B., and D.B. ("the Children"). In 2016, with Father residing in North Carolina and having little contact with the Children, the Indiana Department of Child Services ("DCS") became aware of unsatisfactory conditions at Mother's home and petitioned to have the Children adjudicated to be children in need of services ("CHINS"). Mother admitted that she had tested positive for methamphetamine and that conditions in her home were unsatisfactory. The juvenile court issued a dispositional order in which it, *inter alia*, ordered Mother to attain and maintain sobriety and obtain stable income and housing. With a few minor exceptions, Mother did not comply with the provisions of the dispositional order, and in November of 2017, DCS petitioned to terminate her and Father's parental rights in the Children. Following a hearing, the juvenile court ordered that Mother's and Father's rights in the Children be terminated. Mother contends that the juvenile court's termination of her parental rights is clearly erroneous. Because we disagree, we affirm.

# Facts and Procedural History

[2] Mother and Father are the biological parents of H.B. (born January 23, 2003), T.B. (born July 10, 2005), W.B. (born August 17, 2006), and D.B. (born November 14, 2009). In 2009, while Mother and the Children were living in North Carolina with Father, the Children were adjudicated to be CHINS due to substantiated concerns about Mother's mental health, an unsafe home, and domestic violence. By 2012, Mother and the Children had moved to Jefferson County, Indiana, and, on June 27, Mother entered into an informal adjustment with the local DCS office. On October 12, 2012, based on concerns about housing instability and Mother's poor mental health, lack of income, and inability to adequately parent the Children, DCS filed petitions to have the Children adjudicated to be CHINS. The Children were adjudicated to be CHINS and were removed from Mother's care for a total of 801 days between October 6, 2012, and July 6, 2015, when they were returned to Mother's care.

[3] By February of 2016, Mother and the Children were living in Decatur County with Mother's boyfriend when DCS received reports of inappropriate living conditions, sporadic school attendance, substance abuse, lack of supervision, and domestic violence. On March 9, 2016, after the reports were substantiated, DCS petitioned to have the Children adjudicated to be CHINS. At a hearing on March 10, 2016, Mother admitted to testing positive for methamphetamine and that the home conditions were inadequate. The juvenile court adjudicated the Children to be CHINS. On April 8, 2016, the juvenile court issued a dispositional order in which it, *inter alia*, ordered Mother to

(1)     keep all appointments with service providers, DCS or the Court Appointed Special Advocate ("CASA") or provide advanced notice of a missed appointment;

(2)     maintain suitable, safe, and stable housing with adequate bedding, functional utilities, adequate supplies of food, and food-preparation facilities;

(3)     secure and maintain a legal and stable source of income;

(4)     not use, consume, manufacture, trade, distribute, or sell any illegal controlled substances;

(5)     obey the law;

(6)     participate in home-based counseling, random drug screens, a parenting assessment, a substance abuse assessment, and psychological evaluation and complete all recommendations developed as a result; and

(7)     attend all scheduled visitation.

On February 2, 2017, DCS changed the permanency plan from reunification to adoption. On May 10, 2017, the juvenile court amended the dispositional order to include Father, who had been located.

[4]     On November 2, 2017, DCS petitioned to terminate Mother's and Father's rights in the Children. On June 28, 2018, the juvenile court held an evidentiary hearing on the termination petitions. At the beginning of the hearing, Father, appearing telephonically, voluntarily agreed to the termination of his parental rights in the Children.

[5]     Mary Smith, a caseworker for Ireland Home-Based Services, testified that she had been working with Mother and the Children for over two years, supervising visitation. Smith testified that Mother had failed to achieve any of her goals and never identified any circumstances beyond her control that prevented her

success. Smith instructed Mother regarding the steps she needed to take to achieve reunification, but Mother did not take those steps. Mother testified that she was living with a friend in a trailer home but could not recall the address, was not employed, and had last used methamphetamine three weeks before the hearing. Records were admitted indicating that Mother had failed twenty-six drug screens between August of 2015 and June of 2018 and had been arrested on May 8, 2018, for possession of methamphetamine and drug paraphernalia.

[6] Of the four Children, W.B. seems to be the neediest. Therapist Jacquie Huxford from Fayette Regional Care Pavilion testified regarding her interactions with W.B. W.B. had first been admitted to Fayette Regional in September of 2017 due to severe behavioral problems that were disrupting his foster placement, including outbursts, verbal aggression, swearing, threatening, and property destruction. W.B. was eventually diagnosed with reactive attachment order (a result of his frequent moves), post-traumatic stress disorder, and attention deficit hyperactivity disorder. At some point during W.B.'s seven-month stay at Fayette Regional, visitation with Mother was suspended, and his treatment progressed more rapidly after that. When W.B. learned in May of 2018 that visitation with Mother had been ordered to resume, he began having nightmares within a week and his bedwetting resumed. Huxford opined that a plan for W.B. that allowed for more stability in the future would be better than one that offered less.

[7] DCS family case manager Renee Wilson ("FCM Wilson") was assigned to the Children's cases in June of 2017 and testified that "[t]here had just not bee[n]

progress made" in addressing the concerns of stability in housing and employment, domestic violence, and sobriety. Tr. Vol. II p. 50. Despite some early progress, Mother remained homeless and unemployed and had not attained or maintained sobriety. As for the Children's needs, FCM Wilson noted that H.B. had been diagnosed with anxiety disorder; W.B. was exhibiting concerning behaviors, including playing with fire; and all four children were wetting their beds. H.B., T.B., and D.B. were placed in the same foster home and had been there for over a year, while W.B. was in a different foster home. W.B. is thriving in his placement and has visitation with his siblings.

[8] As for the services ordered for Mother, although she had completed the psychological evaluation and regularly attended visitation, she had only sporadically participated in home-based case management and had been dismissed from a substance-abuse treatment program. FCM Wilson opined that, given that "we have almost a decade of concerns and issues that haven't been fully remedied[,]" there was no reasonable chance that the concerns would be addressed in the future. Tr. Vol. II p. 53. According to FCM Wilson, it was DCS's position that Mother's parental rights in the Children should be terminated.

[9] CASA Kay Hungate testified that she was appointed to represent the Children in September of 2016. According to CASA Hungate, Mother had, apart from some initial assessments and an unsuccessful attempt at inpatient care for substance abuse, completed none of the twenty-four items listed in the April 18, 2016, dispositional order. Mother does not approve of CASA Hungate and, at

some point, chose not to communicate with her. CASA Hungate testified that the Children were thriving; doing well in school; and always had food, clothing, and shelter. Additionally, CASA Hungate testified that Mother had demonstrated neither the willingness nor the ability to meet her parental responsibilities and opined that there was no reason to believe that she would do so in the future. CASA Hungate testified that it was the in Children's best interests to have Mother's parental rights terminated and to be adopted.

[10] On June 18, 2018, the juvenile court ordered that Mother's parental rights be terminated. The juvenile court concluded, *inter alia*, that

c) There is a reasonable probability that the conditions that resulted in the children's removal and the reasons for placement outside the home of the parents—specifically, the mother's substance abuse, lack of stable and adequate housing, and lack of employment—will not be remedied in the future;

d) There is a reasonable probability that, given the Mother's unresolved substance abuse, the continuation of the parent-child relationship poses a threat to the well-being of the children;

e) Termination of the parent–child relationship is in the best interest of the children; and

f) The proposal made by DCS for the children to be adopted by the present foster placement is a satisfactory plan for the care and treatment of the children.

Order pp. 7–8.

# Discussion and Decision

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Therefore, parental rights are not absolute and must be subordinated to the children's interests in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id.*

In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.* In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn

therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

[13] Indiana Code section 31-35-2-4(b) governs what DCS must allege and establish to support a termination of parental rights. Of relevance to this case, DCS was required to establish by clear and convincing evidence, for each of the Children,

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.
>>
>> [and]
>
> (C) that termination is in the best interests of the child[.]
>
> Ind. Code § 31-35-2-4(b)(2).

[14] It is not disputed that the Children were removed for at least six months pursuant to a dispositional decree, a requirement imposed by Indiana Code section 31-35-2-4(b)(2)(A). Mother contends, however, that DCS failed to establish that (1) the conditions that resulted in the Children's removal were not remedied, (2) the continuation of the parent–child relationship poses a threat to the well-being of the Children, or (3) termination is in the best interests of the Children.

# I. Indiana Code Section 31-35-2-4(b)(2)(B)

Mother contends that the record does not establish a reasonable probability that the reasons for the Children's continued removal would not be remedied or that the continued parent–child relationship posed a threat to the Children. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS was required to establish only one of these circumstances. We choose to first address Mother's contention that DCS failed to establish a reasonable probability that the conditions that resulted in the Children's removal will not be remedied.

> In determining whether "the conditions that resulted in the child's removal … will not be remedied," *id.*, we "engage in a two-step analysis," [*K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1231 (Ind. Ct. App. 2013)]. First, we identify the conditions that led to removal; and second, we "determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quoting [*In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)]) (internal quotation marks omitted). In the second step, the trial court must judge a parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions," [*Bester*, 839 N.E.2d at 152]—balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *K.T.K.*, 989 N.E.2d at 1231 (quoting *Bester*, 839 N.E.2d at 152) (internal quotation marks omitted). We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *See K.T.K.*, at 1234. Requiring trial courts to give due regard to changed conditions does not preclude them

from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642–43 (Ind. 2014) (footnote omitted).

[16] The conditions that led to the Children's removal were inappropriate living conditions, sporadic school attendance, Mother's substance abuse, lack of parental supervision, and domestic violence. DCS produced ample evidence to establish a reasonable probability that many, if not all, of these conditions would not be remedied. At the termination hearing, Mother admitted that she had used methamphetamine three weeks previously. Mother failed over two dozen drug screens between August of 2015 and June of 2018, did not always participate in screening and only briefly participated in inpatient treatment, which did not take. Moreover, Mother does not have a stable housing or employment history. Mother testified that she was living in a friend's trailer home and admitted that she was unemployed. Indeed, the only indication of any gainful employment during this case was a brief stint at Dollar Tree. Mother also has a history of becoming involved in relationships that feature domestic violence, first with Father in North Carolina and then with a boyfriend in Indiana.

[17] In short, not much seems to be have changed in the almost ten years since authorities first became involved with the Children in North Carolina, and we agree with FCM Wilson's assessment that there is little reason to expect improvement in the future. Mother points to her testimony that she has no intention of renewing her relationship with her violent boyfriend (who is

currently incarcerated), has located housing in Indianapolis, and will remain sober. The juvenile court was under no obligation to credit this testimony and apparently did not. The juvenile court did not abuse its discretion in concluding that the conditions that led to the Children's removal would not be remedied. Because we have so concluded, we need not address Mother's contention that the trial court erred in finding that continuation of the parent–child relationship would pose a threat to the Children.[2]

## II. Indiana Code Section 34-35-2-4(b)(2)(C)

[18] Mother contends that insufficient evidence supports the juvenile court's finding that termination is in the Children's best interests. We are mindful that in determining what is in the best interests of the Children, the juvenile court "is required to look beyond the factors identified by [DCS] and look to the totality of the evidence." *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.*

[19] CASA Hungate testified that it was in the Children's best interests to terminate Mother's parental rights, remain in their placements, and be adopted. FCM Wilson testified that it was DCS's position that Mother's parental rights should

---

[2] A third option for satisfying the provisions of Indiana Code section 31-35-2-4(b)(2)(B) is to establish that the child has been adjudicated to be a CHINS on two separate occasions, which appears to have been the case with the Children. *See* Ind. Code § 31-35-2-4(b)(2)(B)(iii) ("The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]"). Although there does not seem to be any dispute that these prior CHINS adjudications occurred, DCS did not raise this issue below, and the juvenile court did not so find. As this was not a basis of the juvenile court's ruling, we choose to address Mother's argument as raised.

be terminated. Although this evidence by itself is likely sufficient to sustain the juvenile court's finding that termination is in the Children's best interests, *see, e.g.*, *In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (concluding that testimony of GAL and FCM was sufficient to sustain finding that termination was in the child's best interests), this is not the only evidence supporting such a finding.

[20] CASA Hungate testified that, in their current placements, the Children are thriving; doing well in school; and always had food, clothing, and shelter. It seems that W.B., especially, would benefit from termination and the stability that adoption would provide, as the record indicates that the longer W.B. is away from Mother, the more his issues subside. Given the evidence that the Children are continuing to thrive in their current placements and that, as discussed, Mother is still unable or unwilling to provide for even their most basic needs, DCS has produced evidence sufficient to sustain a finding that termination is in the Children's best interests. In summary, Mother has failed to establish that the juvenile court's judgment is clearly erroneous in any respect.

[21] The judgment of the juvenile court is affirmed.

Bailey, J., and Brown, J., concur.